UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

---

ANA CHRISTINE SHELTON, in her capacity as the natural tutrix of S.A. and T.A. and as the administratrix for Nelson Arce's succession,

    Plaintiff,

  v.

COMMUNITY CARE, L.L.C.,

    Defendant.

---

CASE NO. 18-cv-4179

JUDGE ZAINEY

MAGISTRATE JUDGE WILKINSON

JURY TRIAL DEMANDED ON SPECIFIC ISSUES

**FIRST AMDENDED COMPLAINT**

 

**BIZER & DEREUS, LLC**
Attorneys for Plaintiff
Andrew D. Bizer (LA # 30396)
andrew@bizerlaw.com
Garret S. DeReus (LA # 35105)
gdereus@bizerlaw.com
3319 St. Claude Ave.
New Orleans, LA 70117
T: 504-619-9999; F: 504-948-9996

**PRELIMINARY STATEMENT**

1. Nelson Arce was a profoundly deaf individual who communicated primarily in American Sign Language ("ASL"), which was his most effective means of communication. Mr. Arce was a troubled man who was receiving treatment for his mental illness at Community Care Hospital in New Orleans (hereinafter "Community Care Hospital"). Unfortunately, despite an explicit and unambiguous written request that the hospital communicate with him through of sign language interpreters, Community Care Hospital denied Mr. Arce's request. Instead, Community Care Hospital attempted to communicate with Mr. Arce through rudimentary communication techniques such as note-passing. These rudimentary techniques were insufficient, and Mr. Arce was ultimately discharged without having received the same level of care, therapy, and education as a hearing person would have received. As a result of Defendant's failure to provide Mr. Arce with effective communication sufficient to afford him equal access, Mr. Arce returned to his pre-hospitalization behavior. Shortly after his discharge, Mr. Arce overdosed. Mr. Arce passed away several days later as a result of this overdose. While at Community Care Hospital, which is owned and/or operated by the Defendant, the staff and employees failed to provide Mr. Arce with the necessary interpretation and communication services, and thereby failed to ensure effective communication with him in a medical setting.

2. ASL (Mr. Arce's primary language) and English are two completely distinct languages that are mutually unintelligible. They are as different from one another as English is from Russian.

3. Many deaf individuals, including Mr. Arce, do not have full knowledge of written English. Indeed, the median reading comprehension level in English of deaf high school graduates is fourth grade. This is because English is generally a second language (after ASL or

another form of sign language) for individuals who are born deaf or become deaf before acquiring language. In addition, many deaf people acquire English as their second language later in life, and well past the critical developmental period of language acquisition. Further, while a hearing person could easily ask an employee or staff member to explain an unknown medical word or phrase, a Deaf person is unable to ask for assistance in translating unknown English words without the aid of a sign language interpreter or other auxiliary aid.

4. Lip-reading, the ability to understand the speech of another by watching the speaker's lips, is an extremely speculative means of communication and is no substitute for direct doctor-patient communication through a qualified sign language interpreter. Only a small amount of the spoken sounds of aural language are visible, and many of those appear identical on the lips.

5. Video Remote Interpreting (VRI) is a videotelecommunication service for communication with deaf individuals that uses devices such as web cameras or videophones to provide sign language or spoken language interpreting services through a remote or offsite interpreter. The reliability of VRI as communication accommodation for deaf people is reliant upon an Internet connection or strong cellular signal on the VRI device.

6. ANA CHRISTINE SHELTON, in her capacity as the natural tutrix of S.A. and T.A. and as the administratrix for Nelson Arce's succession, brings this lawsuit seeking compensatory and nominal damages and attorneys' fees and costs to redress Defendant's unlawful discrimination on the basis of disability in violation of Section 504 of the Rehabilitation Act of 1973 ("RA"), 29 U.S.C. § 794 and Section 1557 of the Patient Protection and Affordable Care Act ("Section 1557"), 42 USC § 18116. With regards to Ms. Shelton's request for nominal damages, it is Ms. Shelton's position that an award of nominal damages would confer significant

civil rights to the public, as a judgment in her favor against Defendant, regardless of the amount, would deter Defendant from discriminating against deaf individuals in the future.

## THE PARTIES

7. Plaintiff ANA CHRISTINE SHELTON, in her capacity as the natural tutrix of S.A. and T.A. and as the administratrix for Nelson Arce's succession (hereinafter "Plaintiff") brings this action and is an individual residing in Orleans Parish, Louisiana.

8. Mr. Nelson Arce (hereinafter "Mr. Arce") communicated primarily in American Sign Language and was substantially limited in the major life activities of hearing and speaking and as such is a qualified person with a disability within the meaning of the ADA, RA, and Section 1557.

9. Defendant COMMUNITY CARE, L.L.C. (hereinafter "Defendant"), is a Louisiana limited liability company doing business in Orleans parish, Louisiana. Defendant owns, operates, and provides the services offered at Community Care Hospital, which is located at 1421 General Taylor, New Orleans, Louisiana 70115. Defendant is a recipient of federal financial assistance, including Medicare and/or Medicaid reimbursements, and is subject to the requirements of Section 504 of the Rehabilitation Act and Section 1557 of the ACA.

## JURISDICTION & VENUE

10. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1343 for Mr. Arce's claims arising under federal law.

11. Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) because Defendant resides within the jurisdiction of this District, and/or a substantial part of the events that give rise to the claims occurred in this District, and/or Defendant committed discriminatory

acts within the jurisdiction of this District.

## STATEMENT OF FACTS

12. Mr. Arce was a profoundly deaf individual who communicated primarily through ASL.

13. Mr. Arce required auxiliary aids and services to communicate effectively in a medical setting. Mr. Arce required a sign language interpreter to translate and assist him with conveying information back and forth with nurses, doctors, and therapists. Mr. Arce required a sign language interpreter to effectively and meaningfully participate in group therapy sessions and education sessions. Without a sign language interpreter, Mr. Arce would have been unable to meaningfully communicate with nurses, doctors, and therapists.

14. Mr. Arce also suffered from bipolar disorder. As a result of this disorder, Mr. Arce was several to Community Care Hospital several times in the years proceeding April of 2017.

15. As a result of those prior visits to Community Care Hospital, several nurses, doctors, and therapists at the Hospital knew that Mr. Arce was deaf.

16. During his prior visits to Community Care Hospital, Nelson Arce asked for a sign language interpreter but was not provided with an interpreter.

17. During his prior visits to Community Care Hospital, Nelson Arce's father, Lazaro Arce, asked that his son be provided with a sign language interpreter. However, no sign language interpreter was ever provided.

18. By and through the requests of Nelson Arce, Lazaro Arce, Community Care Hospital knew that Mr. Arce needed a sign language interpreter. Further, Community Care

Hospital also had sufficient time to investigate its legal obligations and secure the services of a sign language interpreter.

19. On April 25, 2017, at approximately 4:45 p.m. Nelson Arce arrived at Community Care Hospital. Mr. Arce was transported to Community Care from another hospital where he had been admitted due to the exhibiting of erratic behaviors.

20. On April 25, 2017, at 5:27 p.m. attorney Garret S. DeReus sent a fax on attorney letterhead to Community Care Hospital.

21. In his letter, Mr. DeReus stated as follows:

> "I write to you about by my client, and your patient, Nelson Arce (DOB: ******). As you likely know from his previous treatment with Community Care Hospital, Mr. Arce is Deaf. My understanding is that Mr. Arce has been a patient at your client facility in the past, but that you have failed to provide an ASL interpreter or other communication accommodations during the treatment. It is further my understanding that Nelson was recently admitted to your facility.
>
> As you know, under the Americans with Disabilities Act, the Rehabilitation Act, and the Affordable Care Act, Deaf individuals like Mr. Arce are entitled to reasonable communication accommodations during appointments with their medical providers. The applicable laws and regulations require that the medical provider provide the accommodation – and not the Deaf individual.
>
> I urge you to reach out to a sign language interpreting agencies to schedule a qualified ASL interpreter for Nelson. On the following page, I am providing two resources which provide qualified ASL interpreters. However, please be advised that even if these two agencies cannot make the accommodation on short notice, other sign language interpreting agencies should be contacted to ensure Mr. Arce is afforded effective communication."

22. Attorney Garret DeReus attached the contact information of two sign language interpreting agencies.

23. Mr. DeReus' fax machine provided written confirmation that that fax was received by defendant.

24. The fax number Mr. DeReus used is still the fax number for Community Care Hospital.

25. Mr. Arce has knowledge of written English, but was not an intermediate or advanced reader and thus was not fully proficient in comprehending written English. Mr. Arce did not have advanced knowledge of medical terminology.

26. Upon information and belief, on April 25, 2017, no sign language interpreter was ever provided to Nelson Arce.

27. On April 25, 2017, a nursing note dated 6:09 p.m. states that Mr. Nelson Arce was "minimally communicative." The same nursing note states that Mr. Arce's "mood cannot be assessed."

28. The hospital's inability to perform an assessment of Mr. Arce's mood was exacerbated by the hospital's failure to provide Mr. Arce with a sign language interpreter or a Video Remote Interpreter.

29. Despite the hospital's inability to assess Mr. Arce's mood, the nurse somehow determined that Mr. Arce denied "suicidal ideas or ideation.'"

30. On another page of his medical records from April 25, 2017, a nurse noted that Mr. Arce was "deaf and dumb."

31. At best, the phase "deaf and dumb" implies that Mr. Arce was deaf and unable to speak. At worse, the phase "deaf and dumb" implies that Mr. Arce was deaf and stupid.

32. Even if the phrase "deaf and dumb" implies that Mr. Arce was unable to speak, this assessment was grossly incorrect. Mr. Arce was able to speak, he simply needed the required accommodation (a sign language interpreter) to convey his thoughts and ideas to hearing persons.

33. On the next day, April 26, the nursing notes indicate several goals for Mr. Arce and contain the following statement "Today it was difficult to assess if any progress has been made in reaching these goals or resolving problems."

34. Upon information and belief, on April 25, 2017, no sign language interpreter was ever provided to Nelson Arce.

35. On April 26, 2016, defendant's Psychiatrist performed an assessment of Nelson Arce at 9:00 a.m. No interpreter was provided during this assessment so that Mr. Arce could help communicate with his Psychiatrist, obtain information from his Psychiatrist, or meaningfully participate in his medical care.

36. On April 26, 2016, defendant had a group therapy session that would have helped Mr. Arce express himself and work through his mental illness.

37. No sign language interpreter was provided to Nelson Arce for this group therapy session.

38. In response to a nurse's request that he attend the therapy session, the nursing notes indicate that Mr. Arce provided the following response: "Why, I can't hear."

39. Later in the day, defendant had another therapy session. In this session, participants were supposed to express their feelings and responses through music. No sign language interpreter was provided to Nelson Arce. Without a sign language interpreter, there is simply no way Nelson Arce could have understood the nuances of a therapy session on music.

40. On April 27, 2016, for the first and only time, defendant provided Nelson Arce with a sign language interpreter. Defendant provided Mr. Arce with an interpreter at 1:00 p.m. According to the medical records, the "Therapist, Interpreter and pt. met to complete pt.'s assessment and discharge plan."

41. Upon information and belief, Defendant does not typically conduct an assessment and discharge meeting at the same time for hearing persons. Instead, Defendant decided to conduct an assessment and discharge meeting at the same time to avoid the expense of paying for another sign language interpreter.

42. Even though Defendant conducted a meeting on Mr. Arce's discharge plan on April 27, Mr. Arce was no discharged until May 3. At the time he was actually discharged, no sign language interpreter was provided.

43. Defendant's medical records for Mr. Arce contain a written request by Community Care hospital for the sign language interpreter that was provided on April 27th at 1pm. <u>Defendant's medical records for Mr. Arce do not contain any other written requests by Community Care hospital for a sign language interpreter.</u>

44. On May 8, 2017, Defendant was sent a "litigation preservation hold letter" via fax. Therefore, presumably, Mr. Arce's medical records contain the full set of requests for sign language interpreters that were made by Defendant.

45. On April 27, 2016, defendant had a group therapy session that would have helped Mr. Arce express himself and work through his mental illness. According to the session remarks, defendant's employee played "All of Me" by John Legend and "Get on Your Feet" by Gloria Estefan on speakers. The leader of the session also read discussions for patients to answer and discuss.

46. According to the notes, Mr. Arce "express himself verbally( through writing on paper)/through music to help express himself in an appropriate manner." (sic).

47. No sign language interpreter was provided to Nelson Arce. Without a sign language interpreter, there is simply no way Nelson Arce could have understood the nuances of a therapy session on music.

48. According to Defendant's medical records, April 27, 2016, one of defendant's nurses made a note that "nurses to perform medication and illness education daily until discharge."

49. No sign language interpreter was ever provided to help Mr. Arce understand his medication education.

50. No sign language interpreter was ever provided to help Mr. Arce understand his illness education.

51. Hearing individuals would have been able to participate in medication and illness education on a daily basis.

52. Also according to Defendant's medical records, April 27, 2016, one of defendant's employees made a note that "therapist/counselor establish trusting relationship daily until [discharge]."

53. No sign language interpreter was ever provided to help Mr. Arce develop a trusting relationship with his therapist/counselor.

54. Without a sign language interpreter, there is simply no way Nelson Arce could have developed a trusting relationship with his therapist/counselor.

55. On April 28, 2017, defendant conducted multiple group sessions, such as therapy groups, activity groups, and process groups, and psychotherapy groups. No sign language interpreter was ever provided to allow Mr. Arce to participate in these group sessions.

56. On April 29, 2017, defendant conducted multiple group sessions, such as therapy groups, activity groups, and process groups, and psychotherapy groups. No sign language interpreter was ever provided to allow Mr. Arce to participate in these group sessions.

57. On April 30, 2017, defendant conducted multiple group sessions, such as therapy groups, activity groups, and process groups, and psychotherapy groups. No sign language interpreter was ever provided to allow Mr. Arce to participate in these group sessions.

58. On May 1, 2017, defendant conducted multiple group sessions, such as therapy groups, activity groups, and process groups, and psychotherapy groups. No sign language interpreter was ever provided to allow Mr. Arce to participate in these group sessions.

59. A note from Mr. Arce's medical records from May 1, 2017, notes that the "Mr. Arce did not attend group today. He did not attend for the following reason: He reported that he did not wish to attend because he cannot actively participate due to his hearing impairment."

60. On May 2, 2017, defendant conducted multiple group sessions, such as therapy groups, activity groups, and process groups, and psychotherapy groups. No sign language interpreter was ever provided to allow Mr. Arce to participate in these group sessions.

61. On May 2, 2017, on the of the group sessions was on a lyrics discussion on Michael Jackson's 1987 song, "Man in the Mirror".

62. According to the therapy notes, "Pt did not engage in the session."

63. According to another note, Mr. Arce was allegedly able to express "his goals and feelings on paper."

64. Other patients were able to express themselves verbally while talking and listening to music. Mr. Arce, a functionally illiterate and mentally ill individual, was relegated to attempting to communicate his feelings via paper.

65. According to a note from May 3, 2017, "He rarely or never participates in regularly scheduled activities."

66. On May 3, 2017, Mr. Arce was discharged. Upon information and belief, no sign language interpreter was provided for this discharge meeting. Despite the fact that Mr. Arce never received an equal opportunity to be educated on his illness, conduction, medication, or coping mechanisms—Mr. Arce was discharged.

67. Mr. Arce was released from Community Care directly to Savannah Turcic, Mr. Arce's fiancée at the time her apartment.

68. Upon information and belief, Mr. Arce was brought to Ms. Turcic's apartment via a van or van service owned, operated, and/or contracted by Community Care.

69. The van then took Mr. Arce to the home of Ms. Turcic.

70. On May 3, 2017, without the education or information he needed, Mr. Arce relapsed and overdosed.

71. On May 9, 2017, Nelson Arce died.

72. Nelson Arce's death is casually and proximately related Defendant's failure to provide him with the necessary accommodations and required effective communication.

73. Defendant's failure to provide Mr. Arce with effective auxiliary aids and services when he sought emergency psychiatric treatment caused Mr. Arce to experience fear, anxiety, emotional distress, invasion of his civil rights, denial of self-determination, and mental anguish regarding his health. Ultimately, this also resulted the death of Nelson Arce.

74. Defendant, through its staff, employees, nurses, and/or doctors, knew or should have known of their obligations under the Americans with Disabilities Act, Section 504 of the Rehabilitation Act, and Affordable Care Act to provide accommodations to individuals with

disabilities, including individuals who are deaf, and to develop policies to promote compliance with these statutes.

75. Defendant, through its staff, employees, nurses, and/or doctors, knew or should have known that the actions and/or inactions of its staff created an unreasonable risk of causing Mr. Arce greater levels of fear, anxiety, indignity, humiliation, and/or emotional distress than a hearing person would be expected to experience.

76. The harm sustained by Mr. Arce herein is the expected and foreseeable consequence of Defendant's failure to comply with the requirements and mandates of federal civil rights laws. These statutes and accompanying regulations exist to ensure that individuals with disabilities who have communication limitations will have full use of all services, programs, and activities provided or made available by public entities. When Defendant failed to adhere to its obligations under these statutes and regulations, it was imminently foreseeable that individuals with disabilities would sustain the exact harms alleged by Mr. Arce in this lawsuit.

77. Defendant, through its staff, employees, nurses, and/or doctors, staff failed to assess the communication abilities and needs of Mr. Arce.

78. Despite Defendant's explicit knowledge of its obligation to accommodate persons with disabilities – including individuals that are deaf – Defendant did not take adequate steps to ensure that it provided effective communication to Mr. Arce.

79. As a result of Defendant's failure to ensure effective communication with Mr. Arce, he received services that were inferior to those provided to hearing individuals.

80. Defendant discriminated against Mr. Arce with deliberate indifference to his communication needs.

81. Based on the facts alleged above, Defendant intentionally discriminated against Mr. Arce.

82. Further, Defendant was purposeful in its choices, which is sufficient to constitute intentional discrimination under the RA and ACA.

83. By and through Defendant's failure to make its healthcare services meaningfully accessible to individuals who are deaf, Defendant committed disparate impact discrimination sufficient to state a claim for damages under the RA and ACA.

### CLAIM 1: VIOLATIONS OF SECTION 504 OF THE REHABILITATION ACT

84. Plaintiff repeats and realleges all preceding paragraphs in support of this claim.

85. At all times relevant to this action, Section 504 of the Rehabilitation, 29 U.S.C. § 794, has been in full force and effect and has applied to Defendant's conduct.

86. At all times relevant to this action, the United States Department of Health and Human Services ("HHS") regulations implementing Section 504 of the Rehabilitation Act, 45 C.F.R. Part 84, have been in full force and effect and have applied to Defendant's conduct.

87. At all times relevant to this action, Mr. Arce had substantial limitations to the major life activities of hearing, speaking, and seeing, and was an individual with a disability within the meaning of the Rehabilitation Act, 29 U.S.C. § 705(9).

88. At all times relevant to this action, Defendant offered a program or activity receiving federal financial assistance pursuant to 29 U.S.C. § 794(b).

89. Section 504 of the Rehabilitation Act provides that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or her disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794.

90. Defendant discriminated against Mr. Arce, solely on the basis of disability, by

denying her meaningful access to the services, programs, and benefits the Defendant offers to other individuals, and by refusing to provide auxiliary aids and services necessary to ensure effective communication, in violation of 29 U.S.C. § 794.

91. Defendant also discriminated against Mr. Arce, solely on the basis of disability, by denying plaintiff's reasonable accommodation requests, in violation of 29 U.S.C. § 794.

92. Plaintiff is therefore entitled to seek and recover compensatory damages for the injuries and loss Nelson Arce sustained as a result of Defendant's discriminatory conduct and deliberate indifference alleged herein, pursuant to 29 U.S.C. § 794(a).

93. Plaintiff is further entitled to an award of attorneys' fees, costs, and disbursements pursuant to the Rehabilitation Act, 29 U.S.C. § 794(a).

## CLAIM 2: VIOLATIONS OF SECTION 1557 OF THE PATIENT PROTECTION AND AFFORDABLE CARE ACT

94. Plaintiff repeats and realleges all preceding paragraphs in support of this claim.

95. At all times relevant to this action, Section 1557 of the Patient Protection and Affordable Care Act ("Section 1557"), 42 USC § 18116 was in full force and effect, and applied to Defendant's conduct.

96. At all times relevant to this action, Section 1557, 42 USC § 18116, incorporated the definition of disability in the Rehabilitation Act, 29 U.S.C. § 705(9).

97. At all times relevant to this action, Mr. Arce had substantial limitations to the major life activity of hearing, speaking, and seeing, and was an individual with disabilities within the meaning of the Rehabilitation Act, 29 U.S.C. § 705(9) and of Section 1557, 42 USC § 18116.

98. At all times relevant to this action, Mr. Arce's primary language for communication was American Sign Language, and not English; Mr. Arce has limited ability to read, write, speak, or understand English, and was an individual with limited English proficiency

within the meaning of Section 1557, 45 C.F.R. § 92.4.

99. At all times relevant to this action, Defendant received federal financial assistance, including Medicaid and/or Medicare reimbursements, and was principally engaged in the business of providing health care. Therefore, Defendant is a health program or activity receiving federal financial assistance pursuant to 42 U.S.C. § 18116(a).

100. Pursuant to Section 1557, "an individual shall not, on the ground prohibited under . . . section 504 of the Rehabilitation Act of 1973 (29 U.S.C. § 794), be excluded from participation in, be denied the benefits of, or be subjected to discrimination under, any health program or activity, any part of which is receiving Federal financial assistance . . ." 42 USC § 18116.

101. Defendant discriminated and continues to discriminate against Mr. Arce solely on the basis of disability, by denying her meaningful access to the services, programs, and benefits that Defendant offers to other individuals and by refusing to provide auxiliary aids and services necessary to ensure effective communication in violation of Section 1157, 42 U.S.C. § 18116.

102. Defendant discriminated against Mr. Arce by failing to ensure effective communication through the providing of qualified sign language interpreters on-site and/or through fully functioning VRI machines.

103. Defendant discriminated against Mr. Arce by denying her requests for reasonable accommodations of a live interpreter and providing her a malfunctioning VRI.

104. On information and belief, the refusal to offer on-site ASL interpreter services is as a result of the Defendant's policy or practice to prohibit or impede the use of on-site qualified sign language interpreters without regard to whether VRI services will provide effective communication.

105. Plaintiff is therefore entitled to seek and recover compensatory damages for the injuries and loss she sustained as a result of Defendant's discriminatory conduct as hereinbefore alleged, pursuant to 42 U.S.C. § 18116(a).

106. Plaintiff is further entitled to an award of attorney's fees, costs, and disbursements pursuant to 42 U.S.C. § 18116(a), the Rehabilitation Act, 29 U.S.C. § 794(a).

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff respectfully prays that this Court grant the following relief against Defendant:

A.   Award to Plaintiff:

   i. Compensatory and nominal damages pursuant to the RA and ACA;

   ii. Reasonable costs and attorneys' fees pursuant to the RA and ACA;

   iii. Interest on all amounts at the highest rates and from the earliest dates allowed by law; and

   iv. Any and all other relief that this Court finds necessary and appropriate.

## DEMAND FOR JURY TRIAL

Plaintiff demands trial by jury on the issues of (1) the injuries Nelson Arce suffered as a result of Defendant's discriminatory conduct; and (2) the quantum of damages that should be awarded.

Dated: October 2, 2018

Respectfully Submitted,

**BIZER & DEREUS, LLC**
Attorneys for Plaintiff
Andrew D. Bizer (LA # 30396)
andrew@bizerlaw.com
Garret S. DeReus (LA # 35105)
gdereus@bizerlaw.com
3319 St. Claude Ave.
New Orleans, LA 70117
T: 504-619-9999; F: 504-948-9996

By:/s/ Garret S. DeReus
    Garret S. DeReus